Jason Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
Kenya Rothstein (Bar No. 340854)
Email: ksr@atalawgroup.com
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland, CA 94609
T: (916) 202-3018

Barak J. Kamelgard (Bar No. 298822)
Email: Barak@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES WATERKEEPER, a California non-profit association,

                Plaintiff,

      v.

GLOBE IRON FOUNDRY, INC., a California corporation, AND DOES 1-99,

                Defendant.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)**

1

2 **Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and

3 through its counsel, hereby alleges the following upon information and belief:**

4 **I.    JURISDICTION AND VENUE**

5          1.     This is a civil suit brought under the citizen suit enforcement provision

6 of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water

7 Act" or "CWA"). (*See* 33 U.S.C. § 1365.) This Court has subject matter jurisdiction

8 over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C.

9 §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the

10 Constitution and laws of the United States).

11         2.     Pursuant to 40 C.F.R. § 135.2(a)(2), on November 6, 2023, LA

12 Waterkeeper issued a 60-day notice letter (the "Notice Letter"), to the registered

13 agent for service of process for Globe Iron Foundry, Inc. (hereinafter "Globe Iron"

14 or Defendant") as the owner and operator of the Facility located at 5649 Randolph

15 St, Commerce, CA 90040, Waste Discharger Identification Number 4 19I003406

16 (the "Facility").[1] Plaintiff issued the Notice Letter to Globe Iron as well as Globe

17 Iron's Vice President and Chief Executive Officer, Jeff and John Pratto,

18 respectively, as the responsible owners, officers, and/or operators of the Facility.

19         3.     The Notice Letter was also sent to the U.S Attorney General Acting

20 Administrator of the United States Environmental Protection Agency ("EPA"), the

21 Acting Administrator of EPA Region IX, the Executive Director of the State Water

22 Resources Control Board ("State Board"), and the Executive Officer of the

23 Regional Water Quality Control Board, Los Angeles Region, ("Regional Board")

24 as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice

25 Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

26

27

28 ────────────────
[1] The Facility is fully described in Section V below.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

4.     The Notice Letter informed Defendant of its ongoing violations of substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 et seq. and California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020) (hereafter the "Storm Water Permit" or "General Permit") and the Clean Water Act at the industrial facility located at 5649 Randolph St., Commerce, CA 90040 with Waste Discharger Identification Number 4 19I003406 (hereafter, the "Facility").

5.     The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

6.     More than sixty (60) days have passed since both the Notice Letter was served on the Defendant and the State and Federal agencies. Plaintiff is informed and believes, and in turn alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. (*See* 33 U.S.C. § 1365(b)(1)(B).)

7.     This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

9.     Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

## II.   **INTRODUCTION**

10.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

11.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

12.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.

13.     Plaintiff specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

III.   **PARTIES**

**A. Los Angeles Waterkeeper**

14.     LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

15.     LA Waterkeeper's members live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

1  implementation of the Clean Water Act and, where necessary, directly initiates
2  enforcement actions on behalf of itself and others.

3      16.    LA Waterkeeper members work, own homes and live in Los Angeles
4  County and use and enjoy the waters near the Facility, including the Los Angeles
5  River and just downstream Queensway Bay, San Pedro Bay, and the Pacific Ocean.
6  (the "Receiving Waters"). LA Waterkeeper members also use and enjoy the
7  bordering parks, beaches, shorelines, pathways, golf courses, and athletic fields.
8  They also enjoy and use other connected waterways to bike, boat, kayak, bird watch,
9  ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. LA
10 Waterkeeper members engage in scientific study through pollution and habitat
11 monitoring and restoration activities in and along all these waters.

12     17.    Discharges of polluted storm water and non-storm water from the
13 Facility degrade water quality and harm aquatic life in the Los Angeles River,
14 Queensway Bay, San Pedro Bay, and the Pacific Ocean and impair LA
15 Waterkeeper's members use and enjoyment of those waters. The unlawful
16 discharge of pollutants from the Facility requires LA Waterkeeper to expend its
17 limited resources to study and combat pollution from the Facility.

18     18.    The violations of the Storm Water Permit and Clean Water Act at the
19 Facility are ongoing and continuous, including but not limited to Defendant's
20 discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's
21 members have been, are being, and will continue to be adversely affected by
22 Defendant's failure to comply with the Storm Water Permit and the Clean Water
23 Act.

24     19.    Continuing commission of the acts and omissions alleged above will
25 irreparably harm Plaintiff and its members, for which they have no plain, speedy or
26 adequate remedy at law.

27     20.    The interests of LA Waterkeeper's members have been, are being,
28 and will continue to be adversely affected by Defendant's failure to comply with

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

**B. The Owners and/or Operators of the Facility**

21.    Plaintiff is informed and believes, and thereon alleges, that Globe Iron maintains its principal place of business at 5649 Randolph St., Commerce, CA 90040.

22.    Plaintiff is informed and believes, and thereon alleges, that Globe Iron is an owner and operator of the Facility.

23.    Plaintiff is informed and believes, and thereon alleges, that Globe Iron was formed in California and is registered in California.

24.    Plaintiff is informed and believes, and thereon alleges, that the name and address of the Agent for Globe Iron is Jeff Pratto, 5649 Randolph St., Commerce, CA 90040.

25.    Plaintiff is informed and believes, and thereon alleges, that Jeff Pratto is the Vice President of Globe Iron.

26.    Plaintiff is informed and believes, and thereon alleges, that John Pratto is the Chief Executive Officer of Globe Iron.

27.    LA Waterkeeper refers to Defendant Globe Iron, and its management herein as the "Owners/Operators" of the Facility.

**IV.    STATUTORY BACKGROUND**

**A. The Clean Water Act**

28.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

29.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p).) States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342.)

30.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. (*See* 33 U.S.C. § 1311(b).)

31.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. (33 U.S.C. §§ 1311(a), 1342.; *see* 40 C.F.R. § 122.26(c)(1).)

32.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." (33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.)

33.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.)

34.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

operation, or vessel or other floating craft, from which pollutants are or may be discharged." (33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.)

35.     "Navigable waters" means "the waters of the United States." (33 U.S.C. 1362(7); 33 CFR § 328.3.)

36.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (*See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).)

37.     The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

38.     An action for injunctive relief is authorized under Section 505(a) of the CWA, (33 U.S.C. § 1365(a).)

39.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after November 2, 2015, commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects each Defendant to a penalty of up to $64,618 per day per violation.

40.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's Storm Water Permit**

41.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

1  dischargers and/or through the issuance of a statewide general NPDES permit
2  applicable to all industrial storm water dischargers. (*See* 33 U.S.C. § 1342(b).)

3      42.    Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the
4  Administrator of the EPA has authorized California to issue NPDES permits,
5  including general NPDES permits. California has designated the State Board and
6  the Regional Boards to administer its NPDES program. (*City of Rancho*
7  *Cucamonga v. Regional Water Quality Control Bd.*, (2006) 135 Cal. App. 4th 1377,
8  1380-81.) In California, the State Board is charged with regulating pollutants to
9  protect California's water resources. (*See* Cal. Water Code § 13001.) The Storm
10  Water Permit is a statewide general NPDES permit issued by the State Board
11  pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R §
12  123.25. Violations of the Storm Water Permit are also violations of the CWA.
13  (Storm Water Permit, Section XXI(A).)

14      43.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt
15  Water Quality Standards, including water quality objectives and beneficial uses for
16  navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits
17  discharges from causing or contributing to a violation of such state Water Quality
18  Standards. (*See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §
19  122.44(d)(1).)

20      44.    The State Board elected to issue a statewide general permit for
21  industrial discharges. The State Board issued the Storm Water Permit on or about
22  November 19, 1991, modified the Storm Water Permit on or about September 17,
23  1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to
24  Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

25      45.    On July 1, 2015, the current Storm Water Permit became effective and
26  was issued as *NPDES General Permit No. CAS000001 State Water Resources*
27  *Control Board Water Quality Order No. 2014-0057-DWQ*. (Storm Water Permit,
28  Section I(A) (Finding 4).)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

46.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

47.     On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

48.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. (Storm Water Permit, Section I.A (Findings 8, 12).) Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. (Storm Water Permit, Section I.A (Finding 17), Section II.B.)

**C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

49.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. (Storm Water Permit, Discharge Prohibition III(B).)

50.     Effluent Limitations Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

51.    Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

52.    Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). (Storm Water Permit, Section V(A).) EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. (*See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

53.    The 2015 Multi-Sector Permit parameter Benchmarks, among others, are as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0021 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; chemical oxygen demand— 120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—0.47 mg/L; selenium—0.005 mg/L; and silver—0.0032 mg/L.[2] .

54.    The EPA's most recent, 2021 Multi-Sector Permit parameter Benchmarks for the following parameters, among others, are as follows: TSS—100

_____

[2] The 2015 and 2021 Multi-Sector Permit parameter Benchmarks for cadmium, nickel, silver, and zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed herein is based on a hardness of 100 mg/L.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0018 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; nickel—0.47 mg/L; selenium—0.0031 mg/L; and silver—0.0032 mg/L.

55. The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. (*See* Storm Water Permit, Section I(M)(Finding 62).) Annual NALs, not accounting for water hardness, for the following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel—1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; and chemical oxygen demand—120 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. (*Id.*)

56. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

57. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. (Stormwater Permit Section XII.A.)

58. Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

59. Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. (Storm Water Permit, Section VI(B).)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

60.    Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

61.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

62.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

63.    The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. (Basin Plan, Table 3-8.) The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. (*Id*. at 3-44.) The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." (*Id*. at 3-29.)

64.    The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Angeles River and its watershed.

65.    The Basin Plan specifies potential intermittent and existing beneficial uses for the Los Angeles River Reach 2 including municipal and domestic supply, industrial and service supply, groundwater recharge, warm freshwater habitat, and wildlife habitat. (Basin Plan, Table 2-1.) The Basin Plan further specifies beneficial

14

uses for Reach 1 of the Los Angeles River and the Los Angeles Estuary which include the above and, include but are not limited to, other beneficial uses: marine habitat, estuarine habitat, wetland habitat, spawning, reproduction, and/or early development, migration of aquatic organisms, and rare, threatened, or endangered species. (*Id.*)

66.  Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

67.  Reach 2 of the Los Angeles River is impaired for Trash, Nutrients (Algae), Ammonia, Indicator Bacteria, Oil, Copper, and Lead. It has been proposed in the Draft California 2024 Integrated Report that Reach 2 will also be listed for O&G and Zinc. Further downstream, Reach 1 of the Los Angeles River is impaired for Copper (Dissolved), Cadmium, Ammonia, Zinc (Dissolved), pH, Cyanide, Nutrients (Algae), Indicator Bacteria, Trash, and Lead. It has been proposed in the Draft California 2024 Integrated Report that Reach 1 will also be listed for Aluminum, Iron, and O&G, among other pollutants. The Los Angeles River Estuary and Queensway Bay are also listed for impairments including Chlordane (sediment), DDT (sediment), PCBs (Polychlorinated biphenyls) (sediment), Toxicity, and Trash. It has been proposed in the Draft California 2024 Integrated Report these waters will also be listed for Copper, Indicator Bacteria, Dissolved Oxygen, Temperature, and Zinc. The San Pedro Bay is impaired for Total DDT (sum of 4,4'- and 2,4'- isomers of DDT, DDE, and DDD), PCBs (Polychlorinated biphenyls), Toxicity, and Chlordane. It has been proposed in the Draft California 2024 Integrated Report that San Pedro Bay will also be listed for Copper, DDE, DDT, and Temperature. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

68.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. (40 C.F.R. § 131.38.) The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as, copper (0.013 mg/L) and zinc (0.12 mg/L) in freshwater surface waters with water hardness calculation of 50 mg/L.[3]

69.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. (*See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.)

70.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. (*See* Storm Water Permit, Section VI(A).)

**D. The Storm Water Permit's Numeric Effluent Limitations**

71.     Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Los Angeles River and its tributaries include nitrogen and metals. (Storm Water Permit, Attachment E, Table E-1.)

72.     Discharges from the Facility are subject to the Los Angeles River and watershed TMDL requirements, which include the following NELs: Nitrate-Nitrogen (8.0 mg/L), Nitrite-Nitrogen (1.0 mg/L), Nitrate+Nitrite Nitrogen (8.0 mg/L), Ammonia (8.7 mg/L), copper (0.06749 mg/L), lead (0.094 mg/L), cadmium

---

[3] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. (*See* Storm Water Permit, Attachment H at ¶ 18.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

(0.0031 mg/L), and zinc (0.159 mg/L). (Storm Water Permit, Attachment E, Table E-2.)

73.    An exceedance of an NEL constitutes a violation of the General Permit. (General Permit, Attachment C at 5.) An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. (*Id*.)

**E. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

74.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. (Storm Water Permit, Sections I(I) (Finding 54) and X(B).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. (Storm Water Permit, Section X(H).) The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. (Storm Water Permit, Sections I(D) (Finding 32) and X(C).)

75.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control

measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. (Storm Water Permit, Section X.)

76.    The Site Map shall include the following information: the facility boundary; storm water drainage areas within the facility boundary; portions of any drainage area impacted by discharges from surrounding areas and flow direction of each drainage area; on-facility surface water bodies; areas of soil erosion; location(s) of nearby water bodies (such as rivers, lakes, wetlands, etc.); location(s) of municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized Non-Storm Water Discharges (NSWDs); locations of storm water collection and conveyance systems and associated points of discharge, and direction of flow; any structural control measures (that affect industrial storm water discharges authorized NSWDs, and run-on); all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures; locations where materials are directly exposed to precipitation; locations where significant spills or leaks identified have occurred; areas of industrial activity subject to this General Permit; all storage areas and storage tanks; shipping and receiving areas; fueling areas; vehicle and equipment storage/maintenance areas; material handling and processing areas; waste treatment and disposal areas; dust or particulate generating areas; cleaning and material reuse areas; and, any other areas of industrial activity which may have potential pollutant sources. (Storm Water Permit, Attachment D.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

77.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. (Storm Water Permit, Section X.)

78.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. (Storm Water Permit, Section X(A)-(B).) The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. (Storm Water Permit, Section X(B) and Section XV.)

79.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. (Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1).) Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. (Storm Water Permit, Section X(B)(2).) Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. (*Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).)

/ / /

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

**F. The Storm Water Permit's Monitoring Implementation Program Requirements**

80.    The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). (Storm Water Permit Sections X(I) and XI(A)–(D).) The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. (Storm Water Permit Section XI.) The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. (*Id*.)

81.    Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Storm Water Permit, Section XI.)

82.    The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. (*Id*.)

83.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. (Storm Water Permit, Sections I(J) (Findings 55–56) and XI.)

84.     Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

85.    Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

86.    Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. (*See* Storm Water Permit, Section XI(A)(3).) The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. (Storm Water Permit, Section X(B)(1).)

87.    The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. (Storm Water Permit, Section XI(B)(4).)

88.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

89.    Section XIV of the Storm Water Permit requires dischargers in a compliance group to collect and analyze storm water samples from one (1) QSE within the first half of each reporting year (July 1 to December 31), and one (1) QSE within the second half of each reporting year (January 1 to June 30).

90.    Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

91.    All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 3321, covering Gray and Ductile Iron Foundries.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

Under SIC Code 3321, Globe Iron is also required to sample storm water for zinc, iron, aluminum, and copper. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. (Storm Water Permit, Section XI(B)(6).)

92.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**G. Exceedance Response Action Requirements**

93.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." (*See* 2015 Permit, Section XII(B).) A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. (*See* Storm Water Permit, Section XII(C).)

94.     "Compliance Group Participants with Level 1 status shall certify and submit via SMARTS the Consolidated Level 1 ERA Report." (*See* Storm Water Permit, Section XIV(C)(2).) "The Compliance Group Participants shall certify that they have reviewed the Consolidated Level 1 ERA Report and have implemented any required additional BMPs. Alternatively, the Compliance Group Participant may submit an individual Level 1 ERA Report in accordance with the provisions in Section XII.C.2." (*Id.*)

95.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. (*See* Storm Water Permit, Section

XII(C).) By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. (*See* Storm Water Permit Section XII(C)(1)(a)-(c).)

96.   Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. (*See* Storm Water Permit, Section XII(C)(1)(c).)

97.   Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. (*See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).)

98.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. (*See* Storm Water Permit, Section XII(C)(2)(a)(iii).)

99.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

additional NAL exceedances for that parameter. (*See* Storm Water Permit, Section XII(C)(2)(b).)

100.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. (*See* Storm Water Permit, Section XII(D).) "Compliance Group Participants with Level 2 status shall certify and submit via SMARTS their individual Level 2 ERA Action Plan and Technical Report prepared by their Compliance Group Leader." (*See* Storm Water Permit, Section XIV(C)(3).) "Each Compliance Group Participant shall certify that they have reviewed the Level 2 ERA Action Plan and Technical Report and will implement any required additional BMPs." (*Id.*)

101.   A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. (*See*, Storm Water Permit, Section XII(D).)

## V.   STATEMENT OF FACTS

### A. Globe Iron Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility

102.   Defendant operates an industrial facility located at 5649 Randolph St., Commerce, CA 90040, in close proximity to the Los Angeles River. The Facility's primary industrial purpose is to produce cast iron parts for any number of industries— mostly equipment and durable goods manufacturers. The Facility's SWPPP notes that the site is approximately 2.5 acres of both industrial and non-industrial areas—with the industrial area occupies approximately 1.6 acres and the non-industrial area occupies .9 acres. The SWPPP states that 64% (1.6 acres) of the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

Facility is made up of areas of industrial activity and materials exposed to precipitation. The NOI does not indicate what the percentage of the site is impervious. The site appears to have approximately 9 buildings. The Facility' last updated SWPPP notes that the Globe Iron facility operates 5 days per week, Monday through Friday, from 3:00 am to 11:30 pm.

103.   Many of the industrial activities at the Facility are conducted outdoors and/or exposed to storm water. Globe Iron's industrial activities include fabrication/finishing supporting operations include shipping/receiving, grinding/shotblasting, baghouses/dust collectors, and storage/staging. The facility's primary industry process occurs in the Foundry building where iron is melted in furnaces and poured into molds. Molds are made of sand placed in flasks. Raw materials include iron alloys and clean silica sand. The clean silica sand is treated with resins or other materials to form green sand or no-bake sand molds used to form the molten metal to the shape that is desired. The sand is stored in silos and is mostly reused. There is a pattern making and a maintenance shop in the foundry building. The foundry operations have two (2) baghouses and there is a small dust collector associated with the Pattern Making Shop. The front of the foundry building has air compressors on the west side and transformers on the east side. The air compressors have condensation drips. The area south of Randolph Street includes fabrication/finishing and supporting operations such as shipping/receiving and equipment storage for flasks and other equipment. The shipping/receiving area is also used to stage outgoing baghouse dust and sand waste awaiting pickup for disposal. A grinding room also hosts several shot blast units. Some, but not all, equipment in the building is vented to three (3) baghouses behind the building. Other industrial areas and activities include the hazardous materials and waste storage area, in which 55-gallon drums are located; the forklift/riding sweeper storage; the trash dumpsters; the air compressors; the uncovered scrap metal storage bins; the storm water run-on; and the storm water conveyance system.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

104.   There are waste streams routinely generated at Globe Iron that are concurrent with dust generating activities and potential sources of metal particulate. These include particulate dust from metal melting operations; particulate dust from control of emissions from the sand handling and molding processes; particulate dust from the control of emissions from the sand reclamation process; particulate dust from the removal of casting gates and risers by saw cutting and from the casting, finishing and grinding processes; maintenance shop wood cutting, which is vented to a small baghouse west of the building; metal melting slag waste; and welding.

105.   The industrial areas and associated activities generate and release pollutants at the Facility which are discharged into storm water.

106.   Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water. Pollutants of concern at the Facility include but are not limited to aluminum, O&G, TSS, aluminum, copper, iron, zinc, and pH. These pollutants are subject to tracking to other areas of the Facility, and offsite of the Facility, by employees, transfer of industrial materials between work areas and warehouses, loading and unloading of industrial materials, vehicle and forklift traffic, and use of heavy industrial equipment.

107.   Globe Iron discharges into the Los Angeles River.

108.   The Facility SWPPP describes that the Facility is divided into three (3) drainage areas: the foundry area north of Randolph Street; shipping/receiving and fabrication/finishing operations south of Randolph Street; and two (2) nonindustrial areas at the west end of Randolph. These are referred to as the northern, eastern, and southern drainage areas (Drainage Area 1, Drainage Area 2, and Drainage Area 3, respectively).

109.   The Los Angeles River and the Pacific Ocean are waters of the United States, and which, upon information and belief, receive stormwater discharges from the Facility.

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

## B. The Los Angeles River

110.  LA Waterkeeper's members utilize the Receiving Waters for recreation, scientific study through pollution and habitat monitoring and restoration activities. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Angeles River.

111.  The Los Angeles River and its estuary provide critical habitat for species, including some that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These river reaches support endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. They also support species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

112.  Queensway Bay is the outlet for the Los Angeles River. The surrounding area was formerly wetlands but is now heavily developed and contains a marina, restaurants, and businesses. Ample recreational opportunities exist in and around the bay, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating. The bay provides habitat for an abundant variety of aquatic and bird species and other wildlife.

/ / /

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

**C. The Facility Storm Water Permit Coverage**

113.    SMARTS lists the current Facility WDID number for the Facility as 4 19I003406 and coverage under the Storm Water Permit as "Active."

114.    The NOI for the Facility lists the Receiving Water as the "Los Angeles River".

115.    Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in January 2023.

116.    Plaintiff is informed and believes, and thereon alleges, that Defendant has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least November 6, 2018. Defendant has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

117.    The SWPPP's Site Map does not identify the Los Angeles River.

118.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the Storm Water Permit.

119.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

120.    Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: O&G, TSS, aluminum, copper, iron, zinc, and pH.

121.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (Storm Water Permit, Sections X(H)(1)(a)–(g).) The BMPs that are described in the Facility's SWPPP are insufficient to prevent the NAL and NEL exceedances for constituents listed above. As evidenced by the sample results, the current BMPs at the Facility are inefficient, and the Facility's Monitoring Implementation Plan needs improvement.

122.   Plaintiff is informed and believes, and thereon alleges, that Globe Iron has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. (Storm Water Permit X.H.2.) During the 2018-2019 reporting year, Globe Iron entered Level 2 for aluminum and iron. The most recent BMPs implemented in the 2020-2021 reporting year, due to the averages for zinc being above the NALs and the site returning to ERA Level 1, are not sufficient because exceedances are still occurring for this constituent. During the 2021- 2022 reporting year, the results had averages above the NAL for zinc requiring the site to enter ERA Level 2 on July 1, 2022. To date, this ERA Report has not been filed. These BMPs are insufficient to achieve compliance with the General Permit.

123.   Plaintiff is informed and believes, and thereon alleges, that there are also insufficient minimum BMPs implemented, such as good housekeeping.

124.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least November 6, 2018.

125.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges containing excess levels of aluminum, zinc, and iron occur each time

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

storm water discharges from Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

126.   Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

127.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

128.   Plaintiff is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

129.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

130.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

**D. Storm Water Discharges from the Facility**

131.   As discussed above and as detailed in the Facility SWPPP, there are three (3) discharge points at the Facility where storm water leaves the Facility and is discharged into the Los Angeles River and Pacific Ocean downstream.

132.   Plaintiff is informed and believes, and thereon alleges, that Globe Iron has self-reported NAL and NEL exceedances from the Facility over the past five (5) reporting years and would have had more exceedances had it conducted the requisite sampling.

**E. The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

133.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge with storm water to the Los Angeles River, which flows downstream into Queensway Bay and the Pacific Ocean.

134.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into the Los Angeles River, which flows into Queensway Bay and the Pacific Ocean, all waters of the United States.

135.   Storm water discharges containing pollutants including, but not limited to, heavy metals such as zinc, copper, and iron adversely affect the aquatic environment.

136.   Samples of storm water discharges collected at the Facility contain pollutants including of aluminum, zinc, and iron in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

137.   Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event (a rain event of 0.1 inches or more will

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

generally produce storm water runoff from industrial facilities) at the Facility since November 6, 2018, through the present, Defendant has discharged and continues to discharge storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

**F. Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements**

138. Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

139. Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

140. Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

141. Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

142. Plaintiff is informed and believes, and thereon alleges, during the 2022-2023 report year, Defendant failed to submit any samples that were analyzed to the SMARTS portal.

143. Plaintiff is informed and believes, and thereon alleges, that the sampling points are not representative of the pollution at the Facility as much of the stormwater does not flow to the sampling points.

144.   Plaintiff is informed and believes, and thereon alleges, that since Defendant has failed and continues to fail to collect sufficient and consistent storm water samples, such as the instances described in the paragraphs above, the documented exceedances are not a true representation of the exceedances discharged by the Facility. If Defendant were collecting and analyzing sufficient stormwater samples, there would be a greater number of documented exceedances.

145.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

146.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

147.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

148.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators did not report their non-compliance as required by the Storm Water Permit.

149.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility fail to collect sufficient storm water samples during QSEs.

150.   Based on information available to Plaintiff, it is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

151.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to submit accurate Annual Reports to the Regional Board for the past five (5) reporting years in violation of Section XVI of the Storm Water Permit.

152.   Plaintiff is informed and believes, and thereon alleges, that for the 2022-2023 reporting year, Globe Iron did not conduct the requisite visual observations.

153.   Plaintiff is informed and believes, and thereon alleges, that during the 2018-2019 reporting year, Globe Iron entered Level 2 for aluminum and iron.

154.   Plaintiff is informed and believes, and thereon alleges, that during the 2020-2021 reporting year, the averages for Zinc were above the NALs and the site returned to ERA Level 1. These ERA reports were not timely filed.

155.   Plaintiff is informed and believes, and thereon alleges, that based on currently available data for the 2022-2023 reporting year, the Facility will remain ERA Level 2 status for N+N, O&G and zinc.

156.   Plaintiff is informed and believes, and thereon alleges, that during the 2021- 2022 reporting year, the results had averages above the NAL for zinc requiring the site to enter ERA Level 2 on July 1, 2022. To date, this ERA Report has not been filed.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

157.   Plaintiff incorporate the allegations contained in the above paragraphs as though fully set forth herein.

158.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

159.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. (*See* Storm Water Permit, Sections I(D) (Finding 32)V(A); 33 U.S.C. § 1311(b).)

160.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

161.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

162.   Each day, since at least November 6, 2018, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

163.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 6, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

164.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

165.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

166.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

<div align="center">

**SECOND CAUSE OF ACTION**
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

</div>

167.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

168.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to comply with the Storm Water Permit's Numeric Effluent Limitations.

169.   Plaintiff is informed and believes, and thereon alleges, that Defendant violates, and will continue to violate the Storm Water Permit's Numeric Effluent Limitations each day that storm water discharges from the Facility. (Storm Water Permit, Section V(C).)

170.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

171.   Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

172.   Plaintiff alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

173.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). 151. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 6, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

175.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

176.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water
in Violation of the Storm Water Permit's
Receiving Water Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

177.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

178.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

179.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable

Basin Plan, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

180.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

181.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

182.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

183.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 6, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

184.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

185.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

186.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

## FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

187.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

188.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

189.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

190.    Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

191.    The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from November 6, 2018, to the present.

192.    The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

193.    The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

194.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

195.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 6, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

§ 19.4.

196.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

197.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

198.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act. U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

199.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

200.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

201.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

202.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

203.   The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from November 6, 2018,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

to the present.

204.  The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

205.  The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

206.  Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

207.  By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 6, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

208.  An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

209.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

210.  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SIXTH CAUSE OF ACTION**
**Defendant's Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

211.  Plaintiff incorporates the allegations contained in the above paragraphs

as though fully set forth herein.

212. Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

213. The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. (*See* Storm Water Permit, Section XX(B).)

214. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

215. Further, Defendant has repeatedly failed to submit required ERA Level

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES

1 and/or Level 2 Reports, despite entering into those levels for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

216. The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least November 6, 2018.

217. The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

218. By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 6, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

219. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

220. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

221. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

222. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA,

33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

      **b.**    A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

      **c.**    A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, of $64,618 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

      **d.**    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      **e.**    Any other relief as this Court may deem appropriate.

Dated: January 17, 2024             Respectfully submitted,


                                */s/ Kenya S. Rothstein*
                                Jason R. Flanders
                                Kenya S. Rothstein
                                AQUA TERRA AERIS LAW GROUP
                                Attorneys for Plaintiff
                                LOS ANGELES WATERKEEPER

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVL PENALTIES